IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

WILLIAM SILZELL                                                                    PLAINTIFF

V.                                         NO. 10-3091

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration                        DEFENDANT

## MEMORANDUM OPINION

Plaintiff, William Silzell, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) under the provisions of Title II of the Social Security Act (Act).  In this judicial review,

the Court must determine whether there is substantial evidence in the administrative record to

support the Commissioner's decision.  See 42 U.S.C. § 405(g).

### I.      Procedural Background:

Plaintiff filed his current application for DIB on October 8, 2008, alleging an inability

to work since January 28, 2008, due to "Salmonella in 1990 - arthritis-joint pain, nerves,

depression, neck pain, hand pain."  (Tr. 135-37, 157, 169).  For DIB purposes, Plaintiff

maintained insured status through September 30, 2013. (Tr. 10).  An administrative hearing was

held on December 15, 2009, at which Plaintiff appeared with his counsel, and he and his wife

testified.  (Tr. 26-73).

By written decision dated April 27, 2010, the ALJ found Plaintiff was not disabled prior

to January 23, 2010, but that Plaintiff became disabled on that date, and remained disabled

-1-

through the date of the decision.  (Tr. 21).  The ALJ found that during the relevant time period,

Plaintiff had an impairment or combination of impairments that were severe - degenerative joint

disease/disc disease of his cervical spine and thoracic spine, osteoarthritis of his thumbs

bilaterally, mild hemochromatosis[1] and pain disorder associated with both psychological factors

and general medical condition.  (Tr. 12).  However, after reviewing all of the evidence presented,

he determined that Plaintiff's impairments did not meet or equal the level of severity of any

impairment listed in the Listing of Impairments found in Appendix 1, Subpart P, Regulation No.

4.  (Tr. 14).  The ALJ found that, since January 28, 2008, the alleged onset date, until January

23, 2010, Plaintiff had the RFC to:

> lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or
> walk up to two hours in an eight-hour workday, sit up to six hours in an eight hour
> workday and only occasionally work overhead.  Further, the claimant has been able to
> perform semi-skilled work.  More specifically, the claimant has been able to perform
> work where interpersonal contact is routine but superficial, where the complexity of tasks
> is learned by experience with several variables and judgment within limits and where the
> supervision required is little for routine work but detailed for non-routine work.
> Accordingly, the Plaintiff has been able to perform less than the full range of sedentary
> work.

(Tr. 15).  With the help of a vocational expert (VE), the ALJ determined that between January

28, 2008, and January 23, 2010 (the date the claimant's age category changed), there were jobs

---

[1]Hemochromatosis - Abnormal deposition of hemosiderin in the parenchymal liver cells, causing tissue damage
and dysfunction of the liver, pancreas, heart, and pituitary.  Other clinical signs include bronze pigmentation of
skin, arthropathy, diabetes mellitus, cirrhosis, hepatosplenomegaly, hypogonadism, and loss of body hair.  Full
development of the condition among women is restricted by menstruation and pregnancy.  Cf. *Hemesiderosis* and
*siderosis*.  Dorland's Illustrated Medical Dictionary 849 (31st ed. 2007).

Hemosiderin - An intra-cellular storage form of iron, found in the form of pigmented yellow to brown granules
consisting of a complex of ferric hydroxides, polysaccharides, and proteins with an iron content of about 33 per
cent by weight.  Id. at 854.

Parenchymal - Pertaining to or of the nature of parenchyma.  Id. at 1403.

Parenchyma - The essential elements of an organ; in anatomical nomenclature this refers to its functional elements
as distinguished from its framework, the stroma.  Id.

that Plaintiff could perform, such as mail sorter, production worker, and assembler. (Tr. 20). The ALJ further found that beginning on January 23, 2010, there were no jobs that Plaintiff could perform, and Plaintiff became disabled on that date. (Tr. 21).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on September 16, 2010. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 4). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 8, 9).

## II.    Evidence Presented:

Plaintiff was born in 1960, completed the 12th grade of school, and owned his own hardware store from October of 1983 to January of 2008. (Tr. 157, 161, 174). In the late 1990's, Plaintiff was hospitalized at Baxter Regional Medical Center for food poisoning secondary to salmonella, and thrombophlebitis in the left calf, which was reported as directly related to the recent food poisoning. (Tr. 282).

The next medical record in the transcript is dated May 1, 2001, when Plaintiff presented himself to his treating physician, Dr. Lori M. Cheney, of Mountain Home Medical Group, P.A., after he had been back from Paris for two months. (Tr. 346). Plaintiff had developed pain in the bottom of his feet up into his calves. He was diagnosed with: borderline increased ferritin[2]; hypertension; "salmonella h/o '90 and LLD DVT '90" (lower left extremity deep vein thrombosis). (Tr. 346).

On January 15, 2002, Plaintiff presented himself to Dr. Cheney with constant pain in his

---

[2]Ferritin - The iron-apoferritin complex, one of the chief forms in which iron is stored in the body; it occurs at least in the gastrointestinal mucosa, liver, spleen bone marrow, and reticuloendothelial cells generally. Id. at 697.

-3-

right shoulder blade and right chest and swelling in his right arm.  (Tr. 347).

On January 21, 2004, Plaintiff complained to Dr. Cheney that he was having left calf pain and pain in his ankles, which was burning and went into his toes.  (Tr. 348).  He also reported that his hands felt stiff at times.  Dr. Cheney assessed Plaintiff with:[3] 2) "right hip pain - ?bursitis;" and 3) "foot pain - ?neuropathy".  (Tr. 348).

Plaintiff next presented himself to Dr. Cheney on January 26, 2006.  It was noted that his hypertension was good, and that he had insomnia, and neck and back pain. (Tr. 310).  On March 20, 2006, Plaintiff complained of increased blood pressure and pressure in the back of his neck. (Tr. 310).

On January 11, 2007, Plaintiff presented himself to Dr. Cheney with low neck discomfort, especially when he slept wrong.  Dr. Cheney diagnosed Plaintiff with: HTN (hypertension);  tendon nodule;  and arthralgias.  (Tr. 309).  On February 28, 2007, Plaintiff complained to Dr. Cheney of fever, cough, and that his chest felt full, and on August 8, 2007, he complained to Dr. Cheney that his ankle pain was "real bad."  (Tr. 309).

On January 11, 2008, Plaintiff presented himself to Dr. Cheney, complaining that his feet ached "really bad" up into his legs, especially when he went to bed.  She diagnosed him with 1) foot pain, probably neuropathy; and 2) HTN.[4]

On February 30, 2008, Plaintiff reported to Dr. Cheney that he still experienced upper chest pain, sometimes at rest, but always with any exertion.  (Tr. 353).  On March 4, 2008, Dr. Cheney informed Plaintiff that his ferritin level was at the upper end of normal limits, and told

---

[3]Dr. Cheney's #1 diagnosis is somewhat illegible, but seems to read HTN (hypertension).

[4]The #3 diagnosis is illegible.

-4-

him not to take any type of iron supplements.

On August 27, 2008, Plaintiff reported to Dr. Cheney that he had pain in his upper back that went up into the back of his neck, and that he had it for about 4-6 months.  An x-ray of Plaintiff's cervical spine revealed degenerative changes and foraminal encroachment in his cervical spine, the small joint at C5-C6 were severely arthritic;  and that there was definite posterior spurring at C5-C6, mild at C4-C5 as well.  (Tr. 307, 315).

On September 9, 2008, Plaintiff presented himself to Baxter Regional Medical Center, stating that the previous morning, while sitting at his computer, he developed a tingling down his left arm and throbbing chest pain in his left upper chest.  (Tr. 292).  He was assessed with atypical chest pain, which Dr. Cheney suspected was musculoskeletal, and hypertension, which had been fairly well controlled.  (Tr. 293).  A chest x-ray revealed some minor interstitial[5] and peribronchial[6] change, but no acute process.  (Tr. 301).  On September 10, 2008, Plaintiff underwent a cardiolite stress test, which revealed a normal graded exercise test and normal ejection fraction of 59%.  (Tr. 299).

On October 16, 2008, Plaintiff visited Dr. Cheney for a hospital follow-up.  He told Dr. Cheney that he had tried working at Baxter laboratory, but could not do it because his hands got stiff and he had neck and upper spine pain, as well as pain in the sides of his hips and ankles. (Tr. 351).  He also advised Dr. Cheney that he could not handle the c-spine MRI.  Dr. Cheney assessed Plaintiff with DJD C-spine; arthralgias; and palpations.  (Tr. 351).  Plaintiff was referred to Dr.William S. Dyer for a gastroenterology evaluation for a screening colonoscopy on

---

[5]Interstitial - Pertaining to or situated between parts or in the interstices of a tissue.  Id. at 965.

[6]Peribronchial - Near or around a bronchus.  Id. at 1431.

-5-

October 16, 2008.[7]  (Tr. 458-460).

On October 22, 2008, x-rays of Plaintiff's hands were taken, which revealed some degenerative change, but no fracture or dislocation.  (Tr. 341).

On November 6, 2008, Dr. Vann Smith conducted a neuropsychological evaluation on Plaintiff, and noted in his report that "[m]edical records are being requested for review."  (Tr. 319).  Dr. Smith's diagnosis was:

> Cognitive Dysfunction, Non-psychotic, Secondary to General Medical Condition(s)* (294.9)
> HTN, per patient history
> DDD, per patient history (degenerative disc disease)
> DJD, per patient history (degenerative joint disease)
> Chronic, Multifocal, Non-psychogenic, pain disorder

(Tr. 322).  Dr. Smith recommended referral to a qualified Psychiatrist with experience and expertise in the management of chronic pain syndrome and attendant ABI.[8]  (Tr. 322).  In a Mental RFC Questionnaire prepared by Plaintiff's attorney, Dr. Smith diagnosed Plaintiff as follows:

> Axis I:        Illegible[9]
> Axis II:       None
> Axis III:      Illegible
> Axis IV:       Illegible
> Axis V:        Current GAF - 40
>                Highest GAF previously - 85-90

(Tr. 323).  Dr. Smith opined that Plaintiff was unable to meet competitive standards in 6 out of 16 categories; was seriously limited, but not precluded in 6 out of 16 categories; was limited but

---

[7]As will be discussed later, Plaintiff's colonoscopy revealed a normal colon.

[8]The Court is unsure what Dr. Smith is referencing with this acronym.

[9]The Court believes Axis 1 reads 294.9.  See his diagnosis in the previous paragraph.

-6-

satisfactory in 4 out of 16 categories; and was unable to meet competitive standards in 4 categories.  (Tr. 325).  Dr. Smith also found that Plaintiff's impairments or treatments would cause him to be absent from work more than four days per month.  (Tr. 326).

On November 18, 2008, a colonoscopy revealed Plaintiff's colon was normal.  (Tr. 425, 452, 471).  On December 30, 2008, Dr. Cheney assessed Plaintiff with a panic attack, and Ativan was prescribed.  (Tr. 354).

On January 3, 2009, a limited abdominal ultrasound revealed a "little echogenic material layering in the gallbladder consistent with sludge."  (Tr. 404).  On January 13, 2009, Dr. K. Simon Abraham conducted a General Physical Examination at the request of the Social Security Administration.  (Tr. 355-360).  Plaintiff reported to Dr. Abraham that he could walk a mile at a moderate pace.  (Tr. 355).  Dr. Abraham found Plaintiff to have normal range of motion in his extremities and spine, and that his limb function was normal, including the grip in both hands. (Tr. 357-58).  Dr. Abraham diagnosed Plaintiff with:

> Pain in the neck and upper back, small joints of hands and low back, hip
> Osteoarthritis
> Precardial chest pain related to exercise and exertional dyspnea
> Negative stress test. ?Angina

(Tr. 359).  Dr. Abraham concluded that Plaintiff was able to walk, stand, sit, lift, carry, handle, finger, see, hear and speak without limitations.  (Tr. 359).  However, Dr. Abraham stated that he worried about Plaintiff's chest pain and exertional dyspnea despite a negative stress test, and said Plaintiff needed to have a "cardio cath."  (Tr. 359).

On January 26, 2009, Plaintiff saw Stephen R. Harris, Ph.D., at The Mental Fitness Center of the Ozarks.  (Tr. 366-370).  Plaintiff reported that he rated his pain at an "8 or 9."  (Tr.

AO72A
(Rev. 8/82)

367).  Plaintiff reported to Dr. Harris that he sold his businesses in 2008 because of his pain and

health difficulties.  (Tr. 367).  Dr. Harris noted that Plaintiff came to the evaluation by himself

and did reposition throughout the evaluation and had to rise from a seated position at least once

during the evaluation.  (Tr. 367).  Plaintiff reported that he stayed home most of the time since

he sold his businesses, because he did not have many friends.  (Tr. 368).  The WAIS-III indicated

that Plaintiff's overall level of intellectual functioning was in the slow learner/average range.

The WMS -III indicated that he had average memory with auditory immediate memory and low-

average memory in auditory delayed memory as well as working memory.  Auditory recognition

delayed memory also was average.  Dr. Harris further opined that Plaintiff showed borderline

memory ability in immediate memory and general memory function.  He showed ability below

average in immediate visual memory and delayed visual memory.  Dr. Harris felt that what he

was seeing was that Plaintiff had problems with concentration and attention skills, which would

interfere with some immediate memory, primarily in the visual range. Dr. Harris reported that

Plaintiff appeared to have a great deal of problems coping with physical difficulties associated

with pain and pain perception, and that these interfered with some memory tasks, and that he

seemed to focus a good bit of his difficulties upon his physical complaints.  Dr. Harris diagnosed

Plaintiff as follows:

| | | |
|---|---|---|
| Axis I: | Pain Disorder associated with both psychological factors and general medical condition | |
| Axis II: | No diagnosis on Axis II | |
| Axis V: | GAF - current - 63 | |

(Tr. 369).  Dr. Harris also noted that Plaintiff traveled with his wife, took care of his own

personal needs, such as bathing and clothing, on a daily basis, and drove.  Plaintiff's wife did

-8-

most of the shopping, but both he and his wife did the household chores.  (Tr. 369).  Dr. Harris saw no difficulty in Plaintiff's ability to communicate and socialize, and, other than Plaintiff's perception of pain, which did cause him at times to lose concentration, no particular difficulties were noted with basic work-like tasks involving cognitive ability.  Dr. Harris saw no difficulty in persistence in the completion of tasks, although he noted that Plaintiff may have some difficulty, again due to perception of pain, if the tasks would be relatively long in nature.  Cognitively, Dr. Harris saw no difficulty in Plaintiff's ability to perform these tasks in an acceptable time frame. (Tr. 369).

On January 28, 2009, A Psychiatric Review Technique form was prepared by Dan Donahue.  (Tr. 373- 386).  Dr. Donahue found that Plaintiff had a moderate degree of limitation in restriction of activities of daily living;  difficulties in maintaining social functioning;  and difficulties in maintaining concentration, persistence, or pace;  and had no episodes of decompensation, each of extended duration.   (Tr. 383).   On the same date, Dr. Donahue completed a Mental RFC Assessment. (Tr. 387-390).  Dr. Donahue found that Plaintiff retained the ability to perform semiskilled types of work, and that he was only moderately limited in 4 out of 19 categories and not significantly limited in 15 out of 19 categories.  (Tr. 389).

On January 30, 2009, Plaintiff was admitted to Cox Health hospital for further evaluation of symptoms suggestive of unstable angina pectoris.  (Tr. 394).  Studies were performed to evaluate his coronary arteries and to determine the best means of treatment.  A "cardiac cath" report dated January 30, 2009, revealed a successful left heart catheterization with coronary angiography and left ventriculography, revealing no significant atherosclerotic disease.  (Tr. 392).  On that same date, Dr. Keesag A. Baron assessed Plaintiff with angina pectoris appearing

-9-

to be possible coronary insufficiency, and hypertension. (Tr. 398). In the discharge summery, Plaintiff was diagnosed with chest pain suggestive of coronary insufficiency, crescendo pattern with heart catheterization revealing no significant disease, and chest discomfort, most probably musculoskeletal in origin or gasteroesophageal. (Tr. 395).

On February 17, 2009, Dr. Alice M. Davidson prepared a Physical RFC Assessment. (Tr. 409-416). Dr. Davidson concluded that Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds; frequently lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 410). No postural, visual, communicative or environmental limitations were established. (Tr. 411-413). Plaintiff was reported as limited in reaching all directions (including overhead). (Tr. 412).

On March 13, 2009, Plaintiff presented himself to Baxter Regional Medical Center, and a laparoscopic cholecystectomy[10] with intraoperative cholangiogram was performed. (Tr. 418-430). On March 30, 2009, a laboratory report from Quest Diagnostics revealed that Plaintiff was heterozygous for the C282Y mutation, and that "hereditary hemochromatosis" was an autosomal recessive disorder of iron metabolism that results in iron overload and potential organ failure.

In a letter dated April 20, 2009, Dr. Cheney, Plaintiff's treating physician, stated, in pertinent part:

Cardiology recommended coronary angiography, unfortunately this patient cancelled it

---

[10]Cholecystectomy - Surgical removal of the gallbladder. Id. at 354.

-10-

and it was not completed.  He does have some degenerative type arthritis with some in his thumbs and neck.  He has posterior spurring with moderate to severe changes in his back at C5,6 and somewhat at T4,5.  This could partly be the cause of his headaches and chest pain.

As far as I am aware, he does not have any other major medical issues.  I do believe that he can do a modest degree of activity.  He does have documented osteoarthritis of his neck, back, and hands.  He does not have any neurological abnormalities that I am aware of.  He is able to walk without assistance, squat, bend, and lift.  He does not have any muscular atrophy.  He probably does get hand and neck pain if he does recurrent repetitive activities or if he has to hold his head at a certain position for a prolonged period of time.

(Tr. 443).

On June 3, 2009, Dr. William S. Dyer evaluated Plaintiff upon referral from Dr. Cheney. (Tr. 453-454, 476-77).  Dr. Dyer's impression was elevated iron studies, likely hemochromatosis. Dr. Dyer recommended that Plaintiff begin on weekly phlebotomies,[11] which  Plaintiff did through June and July of 2009.  (Tr. 469, 473, 474, 478, 481, 482, 484, 487, 488, 491, 492).  On October 14, 2009, Plaintiff called Dr. Dyer, stating that he was feeling really bad and tired. Plaintiff reported having joint pain and headaches again, and said that the phlebotomies helped with this and wanted to know if he could go ahead and have this even though he was not due to have another until November 21, 2009.  (Tr. 499).  In an October 15, 2009 record, Dr. Dyer reported that since it was unlikely Plaintiff had any significant iron excess at that time and it had been over two months since his last phlebotomy, it was "ok for him to repeat."  (Tr. 499).  In a message referred to as a phone message and electronically signed by a RN, it was reported that after talking to Dr. Dyer, "he suggest that since patient probably did not have hemocromatosis or if so very, very mild that he should just donate blood."  (Tr. 500).

―――――――――――――――――――

[11]Phlebotomy - 1.  Incision of a vein, as for the letting of blood.  2.  Needle puncture of a vein for the drawing of blood.  Id. at 1454.

On October 16, 2009, Plaintiff presented himself to Dr. Cheney for an evaluation because of his intermittent headaches. (Tr. 455). He also reported having more neck discomfort recently and having headaches mostly in the back of his head. (Tr. 455). Dr. Cheney's impression was:

> 1. Hypertension, running high today. We will increase his Zestoretic to 20/12.5 mg two daily.
>
> 2. Degenerative joint disease of the cervical spine which may also be contributing to his headaches. We will try him on Zanaflex 4 mg ½ to 1 q.h.s.p.r.n. He is to monitor his blood pressure and notify us if it does not come down back to back to goal which is less than 140/90.

(Tr. 455).

On November 18, 2009, Plaintiff presented himself to Dr. Corinne Hiser, of Regional Family Medicine, complaining of depression. (Tr. 456). Dr. Hiser gave Plaintiff samples of Lexapro. (Tr. 456).

Plaintiff's wife, Sharon Silzell, wrote a letter dated December 15, 2009, wherein she stated that in her opinion, all of her husband's problems extended from hemochromatosis, that Plaintiff had been sick for years, and that she believed it was the iron overload in his body. (Tr. 249). At the hearing, Plaintiff stated that his hands were what gave him the most trouble and pain - the joints of his fingers and his wrist and "all those joints it takes to lift." (Tr. 37). He reported that he always had pain in his hands, and that it was worse if he was working. He testified that his upper back was also very bad - that it burned continually. (Tr. 38). He stated that his shoulders had continual pain, and that he had headaches two or three times a month. (Tr. 40-41). He testified that the Lexapro helped him. (Tr. 49). He also stated that sitting bothered him and that he could not be around dust, fumes or gases, because it made his hemochromatosis worse. (Tr. 54). He testified that the phlebotomies helped and that he did not ache completely

-12-

all the time, since having the phlebotomies.  (Tr. 56).  However, he still had joint pain.  (Tr. 58).

**III.    Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for

-13-

at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. §416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC). See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §416.920.

**IV.   Discussion**

Plaintiff raises three points in this appeal: 1) The ALJ erred in rejecting the report of Dr. Smith; 2) The ALJ erred in not following the requirements set forth in the regulations and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984); and 3) The ALJ's decision is not supported by substantial evidence. (Doc. 8).

**A.      Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not

-14-

discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

In the present case, the ALJ found that Plaintiff's medically determinable impairments could reasonable be expected to cause the alleged symptoms. However, he also found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment. (Tr. 16). The ALJ addressed the fact that Plaintiff had the ability to care for his personal grooming needs without assistance, drive, shop, travel, prepare meals and mow his lawn with his wife's help. He also noted that Plaintiff reported to Dr. Abraham that he was able to walk a mile at a moderate pace. The ALJ also properly noted that Plaintiff's salmonella in 1990, as well as the deep vein thrombophlebitis involving his left calf, had been resolved with proper treatment.

With respect to Plaintiff's arthritis-joint pain, neck, back and hand pain, Dr. Abraham, an examining physician, noted that Plaintiff had normal range of motion in his extremities and spine and limbs, and was able to walk, stand, sit, lift, carry, handle, finger, see, hear and speak. In addition, Plaintiff's own treating physician, Dr. Cheney, indicated that she believed Plaintiff could do a modest degree of activity. She acknowledged that Plaintiff had documented osteoarthritis of his neck, back and hands, but did not have any neurological abnormalities of which she was aware. She also noted that Plaintiff was able to walk without assistance, squat, bend, and lift, and that he did not have any muscular atrophy. Dr. Cheney further reported : "He

-15-

probably does get hand and neck pain if he does recurrent repetitive activities or if he has to hold his head at a certain position for a prolonged period of time."  Plaintiff testified that since he had been undergoing the phlebotomies and giving blood, he did not ache completely all the time, but did ache at evenings if he had been on his feet.  It is clear that Plaintiff suffered with some degree of pain prior to January 23, 2010.  However, he has not established that he was unable to engage in any gainful activity during the relevant time period.  See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)(holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)(holding that, although Plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning his daily activities support Plaintiff's contention of total disability prior to January 23, 2010.

With respect to Plaintiff's depression, there is no indication that Plaintiff sought mental health treatment prior to November 6, 2008, when  he presented himself to Dr. Vann Smith for evaluation.  In January 26, 2009, Dr. Harris evaluated Plaintiff's mental status and reported that other than Plaintiff's perception of pain, "which did cause him at times to lose concentration, no particular difficulties were noted with basic work-like tasks involving cognitive ability."  Dr. Harris also noted that although Plaintiff may have some difficulty due to perception of pain if the tasks would be relatively long in nature, cognitively he saw no difficulty in his ability to perform the tasks in an acceptable time frame.  In addition, Dr. Donahue noted that Plaintiff had only a moderate degree of limitation in restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration.  Dr. Donahue concluded

-16-

that Plaintiff retained the ability to perform semiskilled types of work.  In addition, Plaintiff testified that Lexapro helped him.

The ALJ also properly considered and discussed Plaintiff's hemochromatosis, noting that Dr. Dyer reported that if Plaintiff truly had hemochromatosis, it was very mild.  It is also important to note that no physician assessed Plaintiff with physical limitations greater than those determined in the ALJ's decision.

With regard to the testimony of Plaintiff's wife, the ALJ properly considered her testimony but found it unpersuasive.  (Tr. 18-19).  This determination was within the ALJ's province.  See Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995); Ownbey v. Shalala, 5 F.3d 342, 345 (8th Cir. 1993).

Based upon the entire evidence, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### B.        Residual Functional Capacity Assessment

RFC is the most a person can do despite that person's limitations.  20 C.F.R. §404.1545(a)(1).  It is assessed using all relevant evidence in the record.  Id.  This includes medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3).  The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the

-17-

claimant's ability to function in the workplace." <u>Lewis v. Barnhart</u>, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." <u>Id</u>.

In the present case, the ALJ found that Plaintiff could perform sedentary work with limitations. The ALJ discussed Dr. Abraham's findings as well as Dr. Cheney's report that Plaintiff did not have any neurological abnormalities, muscular atrophy, cyanosis, clubbing or edema. The ALJ also discussed Plaintiff's hypertension, stating that his blood pressure had been relatively well controlled with medications, and that workups for chest pain, chest x-rays, and physical examinations did not support the degree of severity that Plaintiff alleged.

The ALJ also discussed the hemochromatosis as well as Dr. Dyer's opinion, and considered the opinions of the state agency medical consultants who provided RFC assessments. He concurred with the opinions of the state agency medical consultants regarding Plaintiff's mental residual functional capacity, but found that Plaintiff's physical abilities were more limited than originally thought, and had been since at least his alleged onset date of disability. The ALJ noted that the state disability determination agency physicians determined that Plaintiff could perform the exertional requirements of light work with only occasional overhead work. Nevertheless, the ALJ concluded that based on Plaintiff's complaints of pain in his neck with associated headaches, joint pain and fatigue, Plaintiff was limited to sedentary work, lifting and/or carrying 10 pounds occasionally and less than 10 pounds frequently, standing and/or walking two hours in an eight-hour workday, sitting about six hours in an eight-hour workday and only occasional overhead work. The ALJ found Dr. Cheney's opinion dated April 20, 2009, to be "somewhat consistent" with the conclusions reached in his decision. He also considered

-18-

Dr. Harris' findings regarding Plaintiff's adaptive functioning, but gave more weight to the opinions of the reviewing state disability determination agency physicians.  Even though Dr. Harris diagnosed Plaintiff with a pain disorder, he also assessed Plaintiff's GAF score as 63.

The Court believes the ALJ's RFC assessment is consistent with the medical evidence of record, including Dr. Cheney's opinion given on April 20, 2009.  Based upon the entire evidence of record, the Court finds substantial evidence support the ALJ's RFC findings.

### C.    Dr. Vann Smith's opinion:

One of Plaintiff's arguments on appeal is that the ALJ failed to give the opinion of the examining physician, Dr. Vann Smith, proper weight.  "A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record. Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010) quoting from Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009).  "When a treating physician's opinion 'are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight.'" Halverson, 600 F.3d at 930, quoting from Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002).  In the present case, the ALJ discussed Dr. Smith's evaluation at length and pointed out several flaws in Dr. Smith's statements and conclusions.  (Tr. 13-14).  The ALJ stated:

> However, the undersigned specifically discounts the report of Dr. Smith and his diagnosis of cognitive disorder as it is not consistent with the objective medical evidence and the claimant's testimony.  Dr. Smith reported a diagnosis of cognitive dysfunction but yet reported that the claimant was oriented in all spheres, that his judgment and insight were intact, that his narratives were fluent, logical and informative without evidence of associational anomaly and that his native intelligence was estimated to lie within the normal range.  Also, Dr. Smith administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), and the claimant attained a verbal I.Q. of 99, a performance I.Q. of 104 and a full scale I.Q. of 100, scores that are not reflective of cognitive

-19-

dysfunction.  Further there is no indication that the claimant's longitudinal functioning or medical history were taken into consideration (Exhibit 4F).

In addition, the restrictions identified by Dr. Smith are extrapolated exclusively from a self-report by the claimant, a snapshot mental status examination and one set of testing. While the claimant indicated to Dr. Smith that he had worsening neurocognitive/emotive symptoms, the undersigned is unable to find where the claimant reported these symptoms to his treating physicians.

(Tr. 14).

Courts have affirmed decisions in which one-time examination reports from Dr. Vann Smith were accorded little weight.  See Hudson v. Barnhart, 2005 WL 1560249, *1 (8th Cir. Jul. 6, 2005)("The ALJ gave good reasons for his resolution of the conflict between the mental RFC opinion of Dr. Smith versus those of consulting psychologist Paul Iles and the agency reviewing psychologists").  In Clement v. Barnhart, 2006 WL 1736629 (8th Cir. June 26, 2006), the Eighth Circuit concluded that the ALJ properly discounted the RFC assessment in Dr. Smith's report "after finding it was not supported by his own testing and evaluation, or by other medical evidence in the record, and was inconsistent with Clement's reported daily activities."  Id. at *1. District Courts in the Western District of Arkansas have affirmed the ALJ decisions which accorded little weight to Dr. Vann Smith's opinions.  See Cole v. Astrue, 2009 WL 3158209, *8 (W.D.Ark. Sept. 29, 2009)(holding that Dr. Smith's opinion was inconsistent with the remaining medical evidence of record);  Partee v. Astrue, 2009 WL 2987398, *1 (W.D. Ark. Sept. 14, 2009)(holding that the ALJ clearly recited the evidence of record and why he gave more weight to the findings of Dr. Bunting over that of Dr. Smith);  Haarstad v. Astrue, 2009 WL 2324711, *5 (W.D. Ark. July 27, 2009).  The court in Cole also found that the ALJ was not biased against Dr. Smith, but merely pointed out the "inconsistencies within Dr. Smith's assessment and the

-20-

inconsistencies between Dr. Smith's assessment and the other medical evidence of record." 2009 WL 3158209 at *8, n.1.  The undersigned is of the opinion that this is exactly what the ALJ did in the present case.

The Court believes that the ALJ properly discounted Dr. Smith's findings and gave appropriate weight to the other treating, examining, and  non-examining physicians.

### D.      Hypothetical Question Proposed to the VE:

At the hearing, the first hypothetical question posed to the VE was as follows:

If we had a hypothetical individual the same age, education, past work as the claimant. Assume from the exertional standpoint the individual is limited to light level work as defined by the Social Security regulations with no overhead reaching.  Assume from a non-exertional standpoint the individual's [sic] limited to work where interpersonal contact is routine but superficial, complexity of task is learned by experience with several variables and judgment within limits, supervision required is little for a routine tasks but detailed for non-routine tasks.   Would such an individual be able to perform the claimant's past work, either of those two jobs?

(Tr. 63).  In response, the VE stated that the past work as a storage facility rental clerk would be available, but not the retail store owner job.  The ALJ then asked the VE to identify other light level jobs that would accommodate "no overhead reaching."   The VE responded that the jobs of office helper, security guard, and small parts assembler would be available.  The ALJ then asked if he reduced the hypothetical down to the sedentary level, would there be any jobs.  The VE responded that the jobs of mail sorter, production workers, and assembler would be available.[12]  (Tr. 64-66).

The Court believes the hypotheticals the ALJ proposed to the VE fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole.

---

[12]Although there is no medical evidence to support Plaintiff's position that he should not be exposed to dust, fumes or gases, the  Court notes that none of these positions involves such exposure.

-21-

See Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005).  Accordingly, the Court believes that the VE's responses to these hypothetical questions constitute substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude him from performing sedentary work as a mail sorter, production worker, and assembler.  Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from VE based on properly phrased hypothetical question constitutes substantial evidence).

Based upon the foregoing, the Court finds there is substantial evidence to support the ALJ's finding that from January 29, 2008, the alleged onset date, to January 23, 2010, the date Plaintiff's age category changed, Plaintiff was not disabled, and there were other jobs that Plaintiff could perform, and that beginning on January 23, 2010, there were no jobs that Plaintiff could perform, and Plaintiff became disabled on that date.

## IV.   Conclusion:

Accordingly, the Court recommends affirming the ALJ's decision and dismissing Plaintiff's case with prejudice.

DATED this 9th day of February, 2012.

/s/ Erin L. Setser
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)